## STATE v. CAMPBELL.

No. 7322.   Decided June 30, 1949.   (208 P. 2d 530.)

See 22 C. J. S., Criminal Law, sec. 692. Best and secondary evidence, see note, 167 A. L. R. 405. See, also, 20 Am. Jur. 364.

*Samuel E. Blackham,* Provo, for appellant.

*George S. Ballif,* Dist. Atty., Provo, *Clinton D. Vernon,* Atty. Gen., *Q. L. R. Alston,* Asst. Atty. Gen. for respondent.

PRATT, Chief Justice.

The defendant was found guilty of grand larceny, and has appealed, raising questions concerning the method of proving value of the articles stolen to be in excess of $50.00, the limit for petit larceny in this State, Section 103-36-4, 5, U. C. A. 1943; venue; and the instruction of the trial court as to lesser included offenses.

A Miss Carol Ann Bulow boarded a bus at Richfield, Utah, enroute to the State of Washington. She had a suitcase with her, containing the articles hereinafter listed. She placed it in a rack above her seat. The bus stopped for about ten minutes at Nephi, Utah, and she got off there. She claims to have noticed her suitcase in the rack at the time she got off. Although she boarded the bus again and again got off and on at Provo, Utah County, Utah, she never saw the suitcase again until the trial. She looked for it and missed it at Provo, and reported its loss at Salt Lake City, Utah. The defendant was apprehended with the suitcase, at Provo, Utah. He had borrowed a tool to try and open it; had tried to sell it; and claimed to have found it; and also claimed to have been drunk at the time. As his connection with the suitcase is not in dispute, we shall not give the evidence in detail.

At the trial an exhibit "D" was presented by the prosecution, upon which were listed the suitcase and its contents

with an evaluation of each article, made by a merchant of Provo, and written by him upon the exhibit. The controversy over this exhibit developed in this way—we quote the testimony of counsel for the defense, given at the trial, as it is not in conflict:

"My name is Samuel E. Blackham. I'm the attorney for the defendant in this case. On the 12th day of January, 1949, I was engaged in the trial of a suit in this court, the name of Busianis v. Mendenhall.

"On this particular day during the noon recess, Mr. George Ballif, the District Attorney, called me and asked me whether or not it would be possible to change the date of the trial of this case from the 23rd of February to—to the 21st—no, the 24th of January. I told Mr. Ballif that I expected to be out of town—go out of town on a Wednesday to attend the marriage of my daughter, and that I probably wouldn't be back by that Monday. He then asked me if it wouldn't be possible for my partner, Clyde Sandgren, to try this case. And I told him that I would take it up with Clyde and let him know. Further, I told him that upon going to lunch I would check with my family to determine whether or not there was any possibility of our being back here on the 24th and if so, why I would agree to the trial of this case on the 24th.

"Along about when I got back from lunch about 25 minutes to— or I'd say half past one, I called Mr. Ballif to tell him that it would be agreeable to us to have the case set for the 24th and he said that he had determined on another matter, that he was going to have the contents of this suitcase appraised by Evan Thomas and that the—for the purpose of returning to Miss Bulow the clothes in the suitcase. He told me. I remonstrated against that and he told me that he wasn't asking me to agree to it at all, that he was just telling me that that was what he was going to do and that he would have Mr. Thomas over in the police department within a few minutes and wanted to know if I would be there and if I wanted to have the defendant there. I told Mr. Ballif that I would be there.

"I got over to the police department and there were certain clothes and this suitcase in the evidence room, and the girl—I don't know her name—who is clerk in the office of the police department there, was there. And Mr. Thomas wasn't there at that time nor neither was Mr. Ballif, as I recall. And neither was Officer Adamson or his partner at that time. I don't recall any other officers. Perhaps Fred Loveless was there.

"A short time after I arrived, Mr. Thomas came and then Mr. Ballif and Mr. Ballif told Mr. Thomas what he wanted, his valuation of this—of the property in this suitcase. And Mr. Thomas then

started to write down the values of some of these articles on a sheet of paper that had been typed as an inventory of goods in this suit-case. And upon my seeing the value he had placed on one or two of the objects in particular—one was, I think, the five wire hangars and another combination wood and wire hangar that he had appraised at eighty five cents. I took issue with Mr. Thomas as to it, that those articles were of that value. He valued another pair of house slippers, sort of a sandal affair with sheepskin with the wool on the outside, strips of sheepskin, I believe over the toe and also around the heel of these slippers. He valued that—those at a dollar. And I got into an argument with him on the question of the value of that article and then Mr. Ballif and I engaged in some conversation about how the inventory should be taken and Mr. Ballif said, 'Well, go ahead and take the inventory.' I told the—Mr. Ballif and those present that I was engaged in a trial in Judge Dunford's court and I had to be there at two o'clock, and I left before the valuation was made. I had neither consented—I had not consented to Mr. Ballif or to any person that the valuation of these goods should be done in that man-ner or that this would be the proper evidence to introduce in the court. That's all."

We quote the exhibit—the first column of figures is in pencil and presumably that of the merchant witness who valued them at the police station. The second column is a typewritten duplicate of those values. All articles listed were claimed by Miss Bulow, also a witness at the trial, to be the same as listed by her for the District Attorney; but they were not produced in court and identified by her; nor submitted to the jury for inspection:

| "Item | Value | |
| --- | --- | --- |
| 1 Black Jacket | 2.00 | 2.00 |
| 1 Red Blouse | 1.50 | 1.50 |
| 1 Figured navy blue dress | 7.00 | 7.00 |
| 1 2 Piece black dress | 8.00 | 8.00 |
| 1 Black blouse | 2.00 | 2.00 |
| 1 Red and black-white plaid skirt | 4.00 | 4.00 |
| 1 Grey skirt | 4.00 | 4.00 |
| 1 Pair flannel pajama | 1.50 | 1.50 |
| 1 White blouse | 2.00 | 2.00 |
| 1 Red striped house dress | 2.50 | 2.50 |
| 1 Plain house dress | 3.00 | 3.00 |
| 1 Pair slack pants | 3.00 | 3.00 |
| 1 Red and white check blouse | 2.00 | 2.00 |

| | | | |
|---|---|--:|--:|
| 1 | Slip apron | 1.00 | 1.00 |
| 1 | Pair pillow cases (blue lace) | 2.00 | 2.00 |
| 1 | Blue sweater | 1.00 | 1.00 |
| 1 | Pair silk Robe | 3.00 | 3.00 |
| 2 | Slips—white and peach | 1.50 | 1.50 |
| 6 | Underwear (panties) | .60 | .60 |
| 1 | Pair embroidery hoops | .35 | .35 |
| 1 | Pair house slippers | 1.00 | 1.00 |
| 1 | Gold heart shaped locket—12 kt | 1.00 | 1.00 |
| 4 | Embroidery floss | .10 | .10 |
| 1 | Pair scissors | .10 | .10 |
| 2 | Brushes | .50 | .50 |
| 2 | Bags—red and black | .75 | .75 |
| 1 | Red belt | .25 | .25 |
| 9 | Hankies | 1.35 | 1.35 |
| 5 | Pair anklet hose | .75 | .75 |
| 1 | Scarf | .50 | .50 |
| 2 | White brassiere | .30 | .30 |
| 1 | Roll film size | .52 | .52 |
| 6 | Hangers—5 wire, 1 wooden | .85 | .85 |
| 1 | Suitcase | 6.00 | 6.00" |

(Totaling $65.92)

The merchant appraiser, who appraised the articles at the police station, was present at the trial as a witness, identified exhibit "D" and his entries thereon; testified that the list represented his opinion of the value of the suitcase and the articles that were taken from it. Counsel for the prosecution then offered exhibit "D" in evidence, and it was admitted over the defense objection. The defense moved to strike it, and the motion was denied.

The defense seeks to invoke the best evidence rule as ground for reversal upon the theory that the failure of the prosecution to present the articles for the inspection of the jury was a failure to present the best evidence of value and prevented a proper cross-examination of the expert witness on values. To illustrate this counsel for the defense refers to the pair of slippers, which, he claims, had they been produced would have convinced the jury that they were worthless.

In propounding his objection to exhibit "D", no doubt counsel is unconsciously influenced by a thought which has been expressed by Burr W. Jones in his volumes on evidence (Section 197), as follows: The best evidence rule

"rests upon the presumption that one who withholds testimony of a higher grade and seeks to substantiate therefor testimony of an inferior kind, does so from some improper motive, and because he is conscious that his claim would not be supported by the testimony which he declines to produce."

The real difficulty in the case, lies in what we believe to be a misconception on the part of counsel for the defense, as to the application of the rule.

Quite aside from the fact that the rule is, under modern law, usually limited to documentary evidence (4 Wigmore on Evidence, 3rd Ed. Sec. 1179, 1181), it has certain qualifications which would exclude the present dispute. The issue here is as to value. Value is, in the vast majority of cases—and it is here—opinion evidence. The expert witness was present in court and gave his opinion. The written list was merely collateral to that opinion. The accuracy of the list, or the condition of the articles was not the best evidence of value. Had the articles been presented, the opinion of the expert would still be the primary proof to present. The best evidence rule is usually applied this way: If the proffered secondary evidence, by its nature, or expressly, indicates that there is more accurate evidence of the fact sought to be proved by it, then, absent a showing that such evidence is not available, the secondary evidence should be rejected and the primary evidence produced. 32 C. J. S., Evidence, § 778, p. 703. To apply that rule to this case would produce this odd result: The opinion of the expert would be accepted as showing that the best evidence of value were the articles themselves, therefore the opinion should go out, and the articles should be produced. The production of the articles would then convince the jury of their true value. The mere statement of this proposition is convincing of its fallacy. The list

is of womens wearing apparel—some of it very intimate. The jury were all men. What is the likelihood of their knowing the values without the opinion of the merchant who has dealt in those articles?

If the expert's opinion was founded upon false premises —the wrong articles, or defective articles—that is a matter of cross examination, and of defense. The prosection proved generally the condition of articles by their valuations; the defense has the burden of tearing down that testimony by cross-examination or by demanding the production of the articles and introducing them if their presentation would better refute the values advanced by the prosecution. If the condition of clothes or of other articles is to be shown in a case, it is not absolutely necessary that they be produced in court; they may be described. (Jones on Evidence as cited above.)

It is conceded of course, that written instruments prepared merely for trial purposes are usually not admissible. 32 C. J. S. Evidence, § 698, p. 592. If presented in the absence of the witness who prepared them, they are apt to run afoul of the hearsay rule. If that witness is present, their practical value lies merely in the summarizing of voluminous testimony—a matter of convenience. There appears to be no reason for testifying to the values article by article. We find no prejudice to the defense in permitting the testimony of value to be presented by general statements of totaling effect. The cross-examination required the witness to be more specific.

In line with the theory of his objection to exhibit "D" counsel proposed the following instruction to the jury:

"You are instructed that the highest proof of which any fact is susceptible is that which presents itself to the senses of the court or jury. Neglect, then, to produce such evidence by any party who has it in his power justifies an unfavorable presumption against him and you are at liberty to draw an unfavorable inference against either party if you think it warranted under all the circumstances

and believe that either party has failed to produce any such evidence."

In view of what we have said above about the best evidence rule, we do not believe there was any error on the part of the lower court in refusing to grant the defendant's request for such an instruction.

Defendant requested the lower court to instruct the jury to return a verdict of not guilty. It is defendant's theory that there is insufficient proof that the offense was committed in Utah County. Nephi, the first stop of the bus after it left Richfield, is in Juab County; and Provo, where defendant was apprehended is in Utah County. No one saw defendant take the suitcase. The testimony was that he was seen in Provo about 6:00 p. m. with the suitcase, trying to get a tool to open it; and also trying to sell it. Counsel for the defense argues that as Miss Bulow testified that she did not arrive in Provo until 9:00 p. m. or so, it is unlikely that defendant could have taken the suitcase in Provo— and then counsel concludes that the suitcase was not taken in Utah County, but must have been taken earlier in some other county. There is a fallacy in this line of argument, however, and that is this: If the defendant was seen in Provo at about 6:00 p. m. with the suitcase he must have had it before it was stolen, as Miss Bulow did not board the bus at Richfield until 6:30 p. m. In other words, there is a discrepancy between Miss Bulow's testimony and that of the other prosecuting witnesses on the element of time. The jury must have concluded her testimony was correct as to time, because they found that the suitcase had been stolen after 6:30 p. m. when she boarded the bus and put it in the rack; and as she testified that she noticed it at Nephi, as still being there, there are good grounds for believing that it was not taken until it arrived at Provo, where she first became aware that it was gone. Defendant claimed he had been in Richfield, too; and that he took a bus out of there. It is not unlikely that they traveled on the same bus. He claimed to have been too drunk to know

how he got the suitcase; and also claims that while he was in Richfield, he had one of his own; but denies that he ever tried to learn what had become of it after its loss. When accosted by one of the officers, he claimed he had found her suitcase. When he asked for a tool to open the suitcase, he told the man whom he asked that he had lost his key to the suitcase.

All told, we think there is sufficient evidence upon which the jury might reasonably conclude that he took the suitcase in Provo, Utah County. We do not think the court committed error in denying the directed verdict.

The last objection raised by the defendant goes to the question of whether or not the court properly instructed as to a lesser included offense.

The section of our code involved, is Section 105-32-5, U. C. A. 1943, which reads as follows:

"When it appears that the defendant has committed a public offense and there is reasonable ground of doubt in which of two or more degrees he is guilty, he must be convicted of the lowest of such degrees only."

The defendant requested the following instruction:

"You are instructed that larceny is divided into two degrees, the first of which is termed grand larceny and the second petit larceny. If it appears to you that the defendant has committed the crime of larceny and there is reasonable ground of doubt in which of the two degrees he is guilty, then he must be convicted of the lower of such degrees, or petit larceny."

The court did not give the instruction desired by the defense in the form so requested; but he did define the greater and the lesser offense each in detail, and pointed out that the latter was included in the former. He then instructed the jury to consider, first, the greater offense and its elements; and if the State failed to prove any one or more of the elements of that offense beyond a reasonable doubt, then the jury should consider the lesser offense. The

Court followed this with an instruction that if the State failed to prove any one or more of the elements of this offense, then they should acquit defendant. Although not stated in its exact words, the jury could not apply the instructions given without applying the requirements of Section 105-32-5, quoted.

We find no prejudicial error in the court's instructions in line with this objection of defendant.

The judgment of the lower court is affirmed.

WADE, WOLFE, LATIMER and McDONOUGH, JJ., concur.